# In the United States Court of Federal Claims

No. 24-351
Filed under seal: May 30, 2024
Reissued: June 11, 2024[*]
FOR PUBLICATION

---

**SAFAL PARTNERS LLC,**

        *Plaintiff,*

v.

**UNITED STATES,**

        *Defendant,*

**and**

**SYNERGY ENTERPRISES, INC.**

        *Defendant-intervenor*

---

*Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, WA, for the plaintiff.

*Matthew J. Carhart*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington DC; *Reid MacHarg* and *Jessica L. Day*, Department of Defense Education Activity, Alexandria, VA, of counsel, for the defendant.

*Samuel S. Finnerty*, PilieroMazza PLLC, Washington, D.C., for the defendant-intervenor.

### MEMORANDUM OPINION

***HERTLING*, Judge**

      In this post-award bid protest, the plaintiff, Safal Partners LLC ("Safal"), alleges that the Department of Defense Education Activity ("DoDEA" or "agency") provided it with misleading information in a post-award explanation after an earlier round of this procurement.

---

[*]Pursuant to a protective order, this opinion was filed under seal on May 30, 2024. The parties were directed to propose any redactions by June 10, 2024; the parties did so. (ECF 45.) The Court adopts the proposed redactions, reflected in this public version of the opinion. Redactions are denoted with three asterisks in square brackets, [***].

In May 2023, Safal submitted an unsuccessful bid to a solicitation to operate the DoDEA Grant Program's Evaluation and Technical Assistance Center ("ETAC"). After the DoDEA awarded the contract to the defendant-intervenor, Synergy Enterprises, Inc. ("Synergy"), the agency provided each unsuccessful offeror with a brief explanation (sometimes referred to by the parties as a "debriefing") explaining the strengths and weaknesses of its proposal.[1]

For reasons unrelated to the debriefing, Safal filed a bid protest in this court in June 2023 (*Safal Partners LLC v. United States*, No. 23-933). The DoDEA agreed to take corrective action, and Safal's protest was dismissed. The DoDEA issued a revised solicitation, open only to the six offerors to the initial solicitation, in August 2023. Four of the six offerors submitted offers to the revised solicitation.

In preparing its revised offer to the revised solicitation, Safal relied on the list of its strengths the DoDEA had provided in its post-award explanation for the initial solicitation.

The agency evaluated the revised proposals and again awarded the contract to Synergy. As with the initial solicitation, the DoDEA again provided the unsuccessful offerors with brief, individual post-award explanations for why their individual offers did not prevail. Upon reviewing that explanation, Safal inferred that the agency had narrowed its definition of "strength" between the initial and revised solicitations.

Based on this inference, Safal again protested, but now alleging that the DoDEA misled it by changing the definition. It alleges that because the agency failed to inform it of this change in definition of what constituted a "strength," the agency misled Safal into crafting its revised proposal in reliance on an inaccurate definition of strength, which competitively weakened its offer.

Safal's challenge fails. The DoDEA did not provide Safal with a misleading definition of strength, because it never provided Safal with any definition of that term. The list of strengths in the DoDEA's explanation of its evaluation of Safal's offer after the initial solicitation neither conveyed a single, objective definition of strength nor reflected a commitment to use the same, unaltered definition in evaluating offers for the post-corrective action solicitation. Instead, the definition of strength on which Safal claims to have relied was one of several possible definitions conveyed by the explanation. The agency had no obligation to intuit that Safal would infer that the DoDEA had employed a particular definition of strength from the initial explanation. As a result, the agency was under no obligation to inform Safal of the precise definition it would

---

[1] Safal, and at times the defendant and Synergy, refers to this explanation as a "debriefing." Formal debriefings are subject to a separate provision of the FAR, 15.506. As Safal points out, however, the content of the explanation provided by the DoDEA here overlaps with the content of a FAR 15.506 debriefing. (*See* ECF 27 at 14.n 2.) Although FAR 8.405-2 governs the brief post-award explanations in this procurement, this opinion uses the terms "explanation" and "debriefing" interchangeably.

instead use in evaluating proposals to the post-corrective action solicitation.

The plaintiff's motion for judgment on the administrative record under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC") is denied, and the defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are granted. The defendant-intervenor's motion to dismiss pursuant to RCFC 12(b)(6) is denied.

## I.   FACTUAL BACKGROUND

The DoDEA provides pre-kindergarten through 12th grade schooling to more than 67,000 dependents of active-duty military and civilian employees by operating approximately 150 schools in the Americas, Europe, and the Pacific region. (AR 5.)[2]  To supplement these military-run schools, the DoDEA has, since 2009, awarded nearly $700 million across approximately 600 grants to "military-connected public-school districts." (*Id.*)  The program evolved and expanded throughout its early years, and in 2018 the DoDEA concluded that it should acquire future administrative support for the grant program through a standardized, yearly competition. (*Id.*)

The DoDEA decided to award the contract to a General Services Administration ("GSA")-certified small business.  The awardee would manage the grant program's ETAC and perform five main tasks:

> (1) provide evaluation services to include merit reviews for potential grant awardees and evaluation support for active grantees, (2) design comprehensive, feasible and cost-effective implementation plan with multiple strategies to build grantees' capacity to implement and sustain strategic activities and positive outcomes[,] . . . (3) host[ ] a website for grantees and DoDEA program staff which facilitates the collection, management, reporting and monitoring of evaluation data and relevant grant information and resources, (4) provid[e] technical assistance, and (5) perform[ ] grantee and program evaluation and reporting analysis.

(*Id.*)  Safal has been the incumbent provider of ETAC-support services since 2018.

After developing an independent cost estimate, the DoDEA issued a Request for Quotes ("RFQ" or "the solicitation") (AR 219-88) on March 28, 2023, with submissions due on May 2, 2023. (AR 219.)  Award was to be made on a best-value tradeoff basis.  The DoDEA would evaluate proposals according to, in order of importance, (1) technical requirements, (2) past performance, and (3) price. (AR 257.)  The DoDEA considered the final factor, price, less important than the technical requirements and past performance combined. (*Id.*)  After a cover letter (Volume 1), each offeror was to submit three volumes, corresponding to each factor the

---

[2] Citations to the Administrative Record are to the pagination reflected in the record, filed at ECF 14, except for references to the supplemental administrative record, filed at ECF 24-1, for which page citations are to the pagination generated by the court's electronic filing system.

DoDEA would evaluate to make the award.  Volume 2 contained an offeror's technical requirements, broken into nine subfactors:

1.     Subfactor 1, Implementation Plan
2.     Subfactor 2, Site Visits
3.     Subfactor 3, Transition Support
4.     Subfactor 4, Grant Competition and Analysts
5.     Subfactor 5, Community of Practice Events
6.     Subfactor 6, Professional Learning
7.     Subfactor 7, ETAC Website and Social Media
8.     Subfactor 8, Evaluation Analysis and Reporting
9.     Subfactor 9, Technical Assistance

(AR 258-59.)

After assigning adjectival ratings to each subfactor, the agency would rate each offeror's overall technical-requirements submission as "exceptional" (the agency later referred to this rating, without explanation of the change, as "outstanding," *see* AR 259), "good," "acceptable," "marginal," or "unacceptable." (AR 258.) An overall rating of "unacceptable" would disqualify the offeror from further consideration in the competition. (*Id.*) The solicitation included a rubric describing each adjectival rating. An "outstanding" proposal demonstrated "very low risk" to the agency and contained "multiple strengths and/or at least one significant strength." (AR 259.) A "good" proposal demonstrated "low risk" to the agency and contained "at least one strength or significant strength." (*Id.*) Although the definitions suggest that to receive a rating of "outstanding" or "good," an offeror was required to convey discrete "strengths" in its proposal, the solicitation did not define the term "strength." Indeed, other than being mentioned as necessary for finding a proposal to be outstanding or good, the solicitation did not require the agency to create any lists of strengths or weaknesses for each proposal and did not define what a strength was. Internal evaluation documents not provided to offerors reflect that the DoDEA defined a strength as "an aspect of the proposal that increases the likelihood of successful contract performance." (AR 923.)

Volume 3 of an offeror's submission described its past performance, which consisted of "relevant past performance references" from recent contracts of similar scope and complexity the offeror had performed. (AR 255.) The agency would "evaluate the offeror[']s past performance to assess its probability of meeting the requirements in the [performance work statement ("PWS")]." (AR 259.) As with the technical requirements, the solicitation included a rubric of the adjectival ratings against which offerors would be graded. The agency assessed offerors' past performance based on the relevancy of that experience ("very relevant," "relevant," "somewhat relevant," and "not relevant") and the confidence the DoDEA had in the offeror's ability to complete the contract ("substantial confidence," "satisfactory confidence," "neutral confidence," "limited confidence," and "no confidence") based on the offeror's collective experience. (AR 260.) The agency would rate offerors without past, relevant experience as "neutral." (AR 261.)

After receiving six offers to the solicitation, the DoDEA awarded the contract to Synergy on June 9, 2023.  (AR 1072.)  It also sent "brief explanation[s]" of the award decision pursuant to FAR 8.405-2(d) to the unsuccessful offerors.  (AR 1089.)  In the brief explanation it sent to Safal, the agency indicated that for its technical proposal Safal had received scores of "pass" for subfactors 1-3, a score of "marginal" for subfactor 4, a score of "good" for subfactor 5, and scores of "acceptable" for subfactors 6-9.  (AR 1096.)  Safal's overall rating for the technical requirements was "acceptable."  (*Id.*)  The agency informed Safal that its proposal had reflected nine strengths, one weakness, and one significant weakness.  (AR 1097.)  The identified strengths, central to this protest, were:

1. The quote provides extensive detail about identifying grant reviewers and the review process, including [***].

2. The quote details experience hosting similar events for federal clients in face to face and virtual environments and how they will leverage past experience to design an interactive event for grantee.

3. The quote identifies [***]-level team of researchers and evaluation experts.

4. Quote provides examples of addressing each goal in [the PWS], including data-driven improvements, which exceeds the minimum requirements.

5. Quote suggests logistical planning includes coordination with local resources, such as Chamber of Commerce or Tourism Bureau.

6. Quote includes suggested topics for learning opportunities of [***].

7. Quote identifies active engagement and best practices in adult learning using [***].

8. Quote identifies benefits of [***] and proposes several opportunities to gather data and produce [***]. This is verified by the examples of innovative work Vender has performed in relation to successful education outcomes.

9. Quote shows Toll-free phone support will be from 7AM-6PM ET and recommends using JIRA as a ticketing system which is more than the minimum requirements listed in PWS.

(*Id.*)

Other unsuccessful offerors received between zero and nine strengths.  (AR 1089-95, 1099-1100.)  Synergy received nine significant strengths and seven strengths.  (AR 923 (referenced as "Vendor 1").)

In June 2023, Safal filed a bid protest in this court (No. 23-933) challenging the award to Synergy. Safal argued that given the significant strengths of its proposal and Synergy's significantly higher price, the agency had acted arbitrarily and capriciously in making its best-value tradeoff decision. The DoDEA elected to take corrective action in response to the protest, but for a different reason. Though Safal and the other offerors were unaware of it at the time, the technical-requirements volume of Synergy's proposal had contained live hyperlinks that Synergy had included to submit additional proposal exhibits; these hyperlinked exhibits resulted in a proposal by Synergy that substantially exceeded the 20-page maximum. (AR 1190.) On July 12, 2023, the DoDEA informed the court that it would: (1) terminate the award to Synergy; (2) amend the solicitation to clarify whether offerors could include live hyperlinks in their solicitations; and (3) solicit revised proposals from the six original offerors and issue a new selection decision. (AR 1190.) In response to the corrective action, the protest was dismissed.

After terminating the award to Synergy, the agency issued an amended solicitation on August 31, 2023. The amended solicitation, materially the same as the original, was open to the six offerors to the initial solicitation. The instructions to offerors were modified to specify that "page limitations shall not be circumvented by including inserted text boxes/pop-ups or internet links to additional information." (AR 1253.) The requirements of the technical, experiential, and pricing factors remained the same, but the DoDEA hired and trained a new evaluation team. (*See* AR 1253-57; *compare* AR 794, 799, 806 *with* AR 2090, 2095, 2101.) The revised solicitation did not include any definition of "strength" or other information regarding potential "strengths" of any proposal. The evaluation information in the amended solicitation was also largely the same as the original but included small changes to the weighting of some factors. (AR 1258-61.) Specifically, although it maintained the same order of importance (technical requirements, past experience, and price), the amended solicitation provided that as "two or more offerors bec[a]me equally rated, price [would] become[ ] more important in the tradeoff decision." (AR 1914.) To be considered for the award, offerors had to receive a rating of "acceptable" or above on all non-price factors. (*Id.*) The DoDEA cautioned offerors "that the award may not necessarily be made to the lowest priced offer." (*Id.*)

Four of the original offerors submitted revised proposals on October 2, 2023. (*See* AR 1224-64.) On November 15, 2023, the agency contacted all offerors, directing them to "apply a price reduction to [their] proposed price," in accordance with FAR 8.405-4.[3] (*See, e.g.,* AR 2237 (email to Safal).) Updated offers were due and were received within two days. (*Id.*)

On February 15, 2024, the DoDEA again awarded the contract to Synergy. (AR 2581-2609.) Although Synergy's proposed price was the highest of all offerors, it offered

---

[3] FAR 8.405-4 provides that "[o]rdering activities may request a price reduction at any time before placing an order, establishing a [blanket purchase agreement ("BPA")], or in conjunction with the annual BPA review. However, the ordering activity shall seek a price reduction when the order or BPA exceeds the simplified acquisition threshold. Schedule contractors are not required to pass on to all schedule users a price reduction extended only to an individual ordering activity for a specific order or BPA."

"quantifiable benefits coupled with [a] reasonable price that is approximately $1.4M below the independent [g]overnment estimate." (AR 2609.) As with the first solicitation, the agency gave unsuccessful offerors notice that it had made an award and again provided brief, summary explanations of its evaluations to the unsuccessful offerors.

In the brief explanation provided to Safal, the agency explained that the proposal was rated as "good," and had received one strength (the proposal for the technical assistance subfactor exceeded the PWS) and no weaknesses or significant weaknesses. (AR 2654.) Overall, Safal received a score of "pass" on subfactors 1-3, a score of "acceptable" on subfactors 4-8, and a score of "good" on subfactor 9. (AR 2655.)

For the amended solicitation, the DoDEA's internal evaluation documents defined a strength as "an aspect of an offerors' proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the [g]overnment during contract performance." (AR 2532.) This definition, which was again not provided to offerors, reflected a change from the definition of "strength" the DoDEA had applied to the initial solicitation, for which a strength was assigned for "an aspect of the proposal that increases the likelihood of successful contract performance." (AR 923.)

The two other unsuccessful offerors also received brief explanations. Both received the same scores as Safal: an overall rating of "good," a strength as to subfactor 9 for exceeding the PWS requirements, no weaknesses or significant weaknesses, and the same scores as to the technical subfactors. (AR at 2651-52, 2658-59.) Overall, because of its price, Safal was ranked third among the four offerors. (AR 2603.)

After receiving notification of the award, a Safal representative contacted the DoDEA contracting officer to ask if the agency would be willing to provide additional feedback on Safal's proposal. (AR at 2661.) The contracting officer declined the request because the agency "ha[d] already provided Safal with extensive feedback" in its post-award explanation. (*Id.*)

## II.    PROCEDURAL HISTORY

Safal filed this action on March 5, 2024. (ECF 1.) Synergy's unopposed motion to intervene (ECF 16) was granted. On April 5, 2024, Safal moved for judgment on the administrative record, supported with a declaration of harm from its chief solutions officer. (ECF 27, ECF 27-1.) It amended its complaint on April 12, 2024. (ECF 30.) The defendant moved for judgment on the administrative record on April 24, 2024 (ECF 32); the defendant also moved to strike portions of Safal's supporting declaration (ECF 31). That same day, Synergy filed a motion to dismiss or for judgment on the administrative record. (ECF 33, ECF 33-1.) In support of its motion to dismiss, Synergy argues that Safal forfeited its ability to protest under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), and fails to state a claim.

In addition to addressing the usual injunction factors regarding potential harm to Safal, the declaration Safal attached to its motion explained what Safal could and would have done

7

differently in its offer to the amended solicitation if it had known that the DoDEA had changed its definition of what constituted a strength in the proposals.

The plaintiff responded to the defendant's and defendant-intervenor's cross-motions for judgment on the administrative record on May 1, 2024. (ECF 37.) It also opposed the defendant's motion to strike. (ECF 38.) The defendant and Synergy filed their replies to the motion for judgment on the administrative record. (ECF 39; ECF 40.) The defendant replied to the plaintiff's opposition to the motion to strike. (ECF 41.) Oral argument was held via video conference on May 16, 2024.

## III.   JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The issuance of a task order under a GSA schedule constitutes an award of a "contract" within this protest jurisdiction. *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 173-74 (2016). No party disputes that jurisdiction exists over this protest.

To have standing in a bid protest action in this court, a plaintiff must be an "interested party." 28 U.S.C. § 1491(b)(1). To qualify as an interested party, an offeror must allege facts, which if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). An offeror can demonstrate a direct economic interest in a post-award bid protest by "show[ing] that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). The "substantial chance" test does not require an offeror to show that, but for the agency's alleged error, it would have been next in line for the contract award, but the offeror must still demonstrate that it had "more than a bare possibility of receiving the award" to have standing. *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).

Safal is an actual bidder for the DoDEA contract. Safal was not next in line for the award, but it plausibly argues that it was misled by the agency. Had it known that the agency had revised its definition for what constituted a strength, it could have prepared a stronger proposal that would have bested Synergy's and the second-ranked offeror's proposals on the technical requirements. No party contests Safal's standing. Accepting its allegations to be true, *see American Relocation Connections, LLC v. United States*, 789 F. App'x 221, 225-26 (Fed. Cir. 2019), Safal has shown that it has "more than a bare possibility of receiving the award." *Precision Asset Mgmt. Corp.*, 125 Fed. Cl. at 233.

## IV.    STANDARDS OF REVIEW

All parties have moved for judgment on the administrative record pursuant to RCFC 52.1, which requires the court to make factual findings based on the administrative record. *Bannum*, 404 F.3d at 1356.  Genuine issues of material fact do not preclude judgment.  *Id.* Rather, the court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record.  *Id.* at 1355; *see also Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018).

Bid protests are evaluated under the Administrative Procedure Act's standard of review. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706).  Under that standard, an agency's procurement action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  A court may grant relief only upon the finding that either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001); *WellPoint Mil. Care Corp. v. United States*, 953 F.3rd 1373, 1377 (Fed. Cir. 2020).  Upon making such a determination, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct."  *Bannum*, 404 F.3d at 1351.  Even if the agency's conduct was arbitrary and capricious or lacked a rational basis, the contract award may not be set aside unless the protester can show it was prejudiced by the conduct.  *See Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021).

A court's review of the procurement decision made by the procuring agency in a bid protest is "highly deferential."  *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court might have reached a different conclusion as to the "proper administration and application of the procurement regulations" in the first instance. *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  A court must take care not to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions.  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The "agency's path" in reaching its decision need only "reasonably be discerned" from the record to be upheld.  *Id.* at 286.

In resolving a bid protest, a court is generally restricted to reviewing the record before the agency at the time it made its decision, not "some new record made initially in the reviewing court."  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).  Any supplementation a court permits "should be limited to cases in which the omission of extra-record evidence precludes effective judicial review."  *Id.* at 1380 (cleaned up).

In addition to its motion for judgment on the administrative record, Synergy has moved to dismiss the case pursuant to RCFC 12(b)(6).  It argues that the plaintiff forfeited its claim under *Blue & Gold Fleet* by failing to clarify or challenge the agency's definition of "strength" prior to award.  *See M.R. Pittman Group, LLC v. United States*, 68 F.4th 1275, 1280 (Fed. Cir. 2023) (dismissal under *Blue and Gold Fleet* is under RCFC 12(b)(6)).  Even if Safal has not

forfeited its claim, Synergy argues that the plaintiff has failed to state a claim upon which relief can be granted, and its complaint must be dismissed under RCFC 12(b)(6).

Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle [the claimant] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). A court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

## V.   DISCUSSION

Safal presents a single claim in its protest: it argues that it was misled when the agency supplied one definition of "strength" in providing the brief explanation on the original solicitation but then applied a different definition in evaluating offers to the amended solicitation. Had "Safal not been misled by the information conveyed (and not corrected) in the June 2023 debriefing, it would have drafted its revised quotation substantially different[ly]." (ECF 27 at 20.)

In response, the defendant argues that the DoDEA did not mislead Safal because it never provided Safal with the definition that was allegedly changed between solicitations. It argues, first, that the plaintiff is mistaken that "the pre-corrective-action definition of 'strength' and the post-corrective-action definition of 'strength' are meaningfully different." (ECF 32 at 17.) Second, the defendant argues that Safal could not have been misled because "at no point in either the solicitation or in the debriefing did the agency define 'strength,'" and all of Safal's inferences about the changed definition stem from its own interpretation of the explanation the agency provided after the initial solicitation, not from anything the agency told Safal. (*Id.* at 18.)

Synergy mirrors the defendant's arguments on the merits of the protest and raises two additional challenges under RCFC 12(b)(6). First, it argues that the protest is untimely and should be dismissed under *Blue & Gold Fleet*. (ECF 33-1 at 14.) Alternatively, it argues that the protest should be dismissed for failure to state a claim because Safal has failed to allege a violation of law or arbitrary and capricious conduct. (*Id.* at 19.)

### A.   Synergy's Motion to Dismiss

#### 1.   Timeliness

Under *Blue & Gold Fleet*, an offeror that perceives a "deficiency or problem in a solicitation" should not "wait to see if it is the successful offeror before deciding to challenge the procurement." *Blue & Gold Fleet, L.P.*, 492 F.3d at 1314. Instead, it must "raise the objection in a timely fashion." *Id.* Synergy argues that "Safal could, and should, have sought clarification of its understanding of the Agency's evaluation standards several times earlier in the procurement process." (ECF 33-1 at 15.) The initial solicitation mentioned but did not define

"strength," and the agency offered vendors a chance to ask questions before submitting their proposals. (*Id.* at 16.) The post-corrective action solicitation, too, omitted a definition of "strength" and again provided offerors an opportunity to ask questions. Safal neither requested clarification of the solicitations nor availed itself of the chance to ask about the agency's definition of "strength." (*Id.* at 17.) Given these opportunities, Synergy argues that "at the latest," Safal forfeited its right to challenge the evaluation process "when it submitted its new quote in response" to the amended solicitation. (*Id.* at 18.)

In response, Safal argues that *Blue & Gold Fleet* does not apply. (ECF 37 at 7.) The rule announced in that case "only applies in situations where a solicitation defect is 'patent,' that is, where a plaintiff 'exercising reasonable and customary care would have been on notice of the now-alleged defect'" before the agency awarded the contract. (*Id.* at 8 (quoting *Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020)).) Neither the initial solicitation nor the revised solicitation provided a definition of "strength," and the agency did not inform vendors that its evaluation criteria would change between the two solicitations. (ECF 37 at 10-11.) Therefore, Safal argues, its challenge does not relate to a patent defect in the solicitation, and the protest is not forfeited.

A defect is patent if it is an "obvious omission, inconsistency or discrepancy of significance." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004). A patent defect "place[s] a reasonable contractor on notice and prompt[s] the contractor" to seek clarification from the agency. *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1380 (Fed. Cir. 2000). A latent defect is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty" to seek clarification. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016) (cleaned up).

The plaintiff has not forfeited its right to protest the agency's actions regarding the definition of strength pursuant to *Blue & Gold Fleet*. While a solicitation's failure to define a term in a solicitation may give rise to a patent ambiguity that the offeror would need to challenge prior to submitting its proposal, both the initial and revised solicitations here mentioned "strength" only in passing. In any case, to the extent that Safal might have sought to challenge the definition of "strength" employed by the DoDEA in this protest, Synergy's objection to the challenge would have had merit. Any challenge to the definition was forfeited when Safal failed to raise the issue before the solicitation closed.

Crucially, Safal does not protest the agency's failure to define "strength" in either the pre- or post-corrective action solicitations. Safal's challenge is that the agency misled it. That challenge could not have been discovered until Safal received its post-award explanation to the revised solicitation.

In the initial solicitation, the agency's technical evaluation criteria (AR 258-59) do not suggest that "strength" is an essential factor to the evaluation necessary for offerors to submit

their proposals.[4]  While the initial solicitation was pending, it did not matter how the agency defined "strength" in the evaluation process, because all offerors were operating with equal information; no one had received information from the DoDEA about how it would assess a strength.  Safal did not forfeit its argument by failing to request clarification of "strength" before submitting its proposal to the first solicitation.

Safal's decision not to protest when the DoDEA issued the revised solicitation also does not lead to forfeiture of its claim under *Blue & Gold Fleet*.  Once Safal obtained the information about the agency's definition of "strength" from the initial debriefing, Safal alleges that it believed the definition was unambiguous.  It therefore had no reason to inquire about or protest the agency's evaluation process before offerors submitted their proposals to the second solicitation.  Regardless of whether Safal correctly inferred that the agency would maintain the initial solicitation's definition of strength for its evaluation of revised offers, nothing in the revised solicitation reflected that the agency would alter the working definitions of any of its evaluation criteria.  With Safal's belief that the DoDEA conveyed an unambiguous definition of "strength" through the post-award explanation to the initial solicitation, Safal would not have interpreted the agency's failure to define "strength" in the revised solicitation as either a problem in need of protest or an ambiguity in need of clarification.

Only after the DoDEA issued the debriefings for the revised solicitation could Safal have inferred that the agency had changed its evaluation criteria.  Safal is not asserting that the DoDEA's definition of "strength" in either solicitation was incorrect or ambiguous.  Rather, it asserts that the agency misled it by providing it with one definition of "strength" for the initial solicitation and then changing that definition without alerting it to the change.  This alleged change could not have been discerned from the revised solicitation, and the plaintiff had no reason to challenge the solicitation or seek clarification.  The protest is timely and not forfeited under *Blue & Gold Fleet.*

## 2.      Failure to State a Claim

Synergy next argues that, even if Safal did not forfeit its claim, the protest should be dismissed for failure to state a claim because Safal has not alleged that the agency violated a law or engaged in arbitrary and capricious conduct.  (ECF 33-1 at 19-23.)  Synergy contends that there is "no legal foundation for a misleading brief explanation of award claim," (*id.* at 20) because debriefings and other post-award correspondence "are not provided for the purposes of obtaining revised quotes and are not subject to express regulatory requirements regarding the treatment of offerors" (*id.* at 21).  At oral argument, Synergy distilled its position further: the facts the plaintiff alleges cannot constitute a violation of law, because no law forbids an agency from misleading an offeror in a debriefing.

---

[4] In the initial solicitation, the term "strength" appears only in one table, as an element of the definitions of an "outstanding" or a "good" technical proposal.  (*See* AR 259.)  The solicitation contains no cues to offerors that "strength" is a term of importance in need of its own definition.

Safal has stated a plausible claim to relief. It alleges that the DoDEA acted arbitrarily and capriciously when it exercised its discretion to provide Safal with a debriefing and then failed to correct information that later became inaccurate. (*See* ECF 30 at 15.) While no regulation governing debriefings expressly forbids an agency from misleading an offeror, lying to or otherwise misleading an offeror is an abuse of discretion. *See* FAR 1.102-2(c) (agencies shall "[c]onduct business with fairness, integrity, and openness"); FAR 1.602-2(b) (contracting officers shall "ensure that contractors receive impartial, fair, and equitable treatment"); *Texas Instruments Inc. v. United States*, 991 F.2d 760, 764 (Fed. Cir. 1993) ("the general obligation of good faith and fair dealing is explicitly imposed on the [g]overnment by [FAR] 1.602-2(b)"); *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1332 (Fed. Cir. 2021) (holding the Administrative Procedure Act's arbitrary and capricious standard applies to a court's review of an agency's alleged breach of the implied covenant of good faith and fair dealing). Synergy's motion to dismiss requires a holding that under no set of facts could an agency's prevarication to an offeror violate the law or be arbitrary or capricious unless specifically forbidden by the FAR. That principle is too broad and would lead to corrosive behavior antithetical to the premises of open and fair competition that underlie the procurement process. Safal alleges facts that, if true, support a claim of arbitrary and capricious conduct inconsistent with an agency's obligations under the FAR. Synergy's motion to dismiss is denied.

## B.   Motions for Judgment on the Administrative Record

Safal's lone allegation is that the DoDEA misled it when information conveyed in the pre-corrective action debriefing became untrue, and the agency failed to issue a correction. Safal argues that the debriefing conveyed one definition of "strength," but the agency subsequently applied a materially different definition of "strength" in its evaluation of offers to the post-corrective action solicitation. The challenge is not that either definition of "strength" was improper, but rather that by disclosing one definition to Safal and then applying another in the next round of evaluations, the agency misled Safal and prevented it from submitting the strongest proposal it could.

Agencies may examine issues "afresh" after a remand. The Supreme Court has explained that when an agency chooses to reconsider a problem through a new action, it is "not limited to its prior reasons but must comply with procedural requirements for new agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891, 1908 (2020); *Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022) (same). Judges on this court have applied *Regents* to bid protests, acknowledging that agencies may consider offers afresh after an agency takes corrective action. *See e.g.*, *Syneren Technologies Corp. v. United States*, 168 Fed. Cl. 756, 769-70 (2023) (finding that the agency elected to "consider the contract award decision afresh" as permitted by *Regents*), *appeal filed*, No. 24-1369 (Fed. Cir.); *Connected Global Solutions, LLC v. United States*, 162 Fed. Cl. 720, 734 (2022) (an agency's "reevaluation of proposals entirely is tantamount to examining the issue afresh"). Safal has not alleged that the DoDEA violated any procedural requirements in its post-corrective action examination of proposals, nor has it explained why subjecting the revised proposals to superficially updated evaluation criteria and assigning new strengths goes beyond the bounds of *Regents*. Thus, to the extent Safal claims the agency strayed from its original definition of "strength" in evaluation of offers to its post-corrective action solicitation, that claim would not be actionable. That is not, however, the

essence of Safal's claim; instead, Safal focuses its claim on the agency misleading it as to the fact of the change.

In making its case that the information the agency conveyed to Safal in its debriefing was misleading, the plaintiff relies heavily on the decision in *East West, Inc. v. United States*, in which Judge Wolski held that information conveyed in a post-award debriefing had misled the offeror and violated the FAR.  No. 11-455C, 2012 WL 4465228 (Fed. Cl. Sept. 26, 2012).

In *East West*, an unsuccessful offeror for a contract for housekeeping staff was informed in a post-award debriefing that the 127 employees it had proposed was too many. *Id.* at *1. When the plaintiff had the opportunity to submit a new proposal after a post-award protest and corrective action resulted in a revised solicitation, it lowered the number of proposed staff in response to the information it had been given in the debriefing. *Id.*  By the second round of evaluations, however, the agency had decided, without notifying the plaintiff or any other offeror, that the agency needed a larger housekeeping staff than the initial solicitation had contemplated.  The agency's revised staffing requirement rendered the plaintiff's proposed staffing in its revised proposal insufficient. *Id.*  Judge Wolski found that the plaintiff had been misled and explained that "[t]he agency has a responsibility to provide accurate, non-misleading information to offerors in debriefings, particularly where, as here, the agency was on notice that a protest was imminent." *Id.*  The agency "had an obligation to correct any misleading communications with offerors" once it became clear that offerors who had received debriefings would submit revised proposals post-corrective action. *Id.*

The present case procedurally mirrors *East West,* as the plaintiffs in both cases challenged an award in a revised solicitation based on information provided to them during a post-award debriefing following the initial solicitation.  Factual differences between the two cases, however, require a different outcome here.

In *East West*, the information conveyed in the debriefing was an objective, quantitative number of desired housekeeping staff.  The agency had initially communicated that the plaintiff's proposed 127 employees was too many, and Judge Wolski found that the agency was obligated to inform the plaintiff when this objective criterion was later changed.  The plaintiff in *East West* was misled because it drew the only conclusion it could from the agency's earlier communication: that its proposed staffing in response to the initial proposal had been excessive.  To come within the holding of that case, Safal argues that, as in *East West*, the DoDEA's listing of the strengths of its initial proposal "objectively conveyed to [S]afal that the [a]gency was assigning [s]trengths for aspects of a quotation . . . that lowered the risk of unsuccessful performance."  (ECF 27 at 15.)  The plaintiff interprets the definition of "strength" applied to the revised proposals, on the other hand, to require a demonstration that the item would exceed the solicitation's technical requirements.

Contrary to Safal's argument, however, the list of strengths provided to Safal in the initial debriefing does not "objectively convey" any definition.  Strengths assigned to Safal's first proposal included both subjective, qualitative aspects, such as Safal's provision of "extensive detail about identifying grant reviewers" and "suggest[ing] topics for learning opportunities of [***]," and objective, quantitative aspects, such as "identif[ying] a [***]-level team of

researchers" and providing "[t]oll-free phone support from 7AM-6PM ET."  (AR 1097.)  While each of these identified strengths could be a feature that lowered the risk of unsuccessful performance, each could just as easily reflect instances of, for example, industry expertise or excellent customer support.  The plaintiff implicitly argues that its definition of "strength" inferred from the debriefing is the only feasible one, but that reading ignores numerous other definitions that could have been inferred.  In fact, the listing of strengths received by the other unsuccessful offerors in their debriefings are equally suggestive of an entirely different definition.[5]  The agency used the post-award explanation to convey offeror-specific strengths, not the definition of "strength" applied to each offer by the agency's technical evaluation team in reviewing and grading all six offers.

In contrast to *East West,* in which the meaning the offeror took from the agency's debriefing—that the offeror had proposed too many staff—was the only reasonable one, the information conveyed in Safal's debriefing is too nebulous to obligate the DoDEA to (a) intuit that Safal had inferred a particular definition, and (b) ensure that Safal knew before submitting its revised proposal how the new technical evaluation team's revisions to the definition of "strength" might conflict with Safal's inferred definition.  In short, *East West* shows that an agency has an obligation to not provide objectively misleading communications it should reasonably know will influence an offeror's future submissions; *East West* does not stand for the proposition that an agency is obligated to correct subjective conclusions or inferences that an offeror silently draws from communications intended solely for retrospective, explanatory purposes.

Beyond *East West*, the plaintiff relies on other cases standing for the proposition that an agency can mislead an offeror by providing information that is accurate when given but later becomes inaccurate and failing to correct the inaccuracy.  Again, the present protest is distinct from these cases.  In cases from this court, like *Raytheon v. United States* and *AshBritt, Inc. v. United States,* and GAO decisions like *Veterans Evaluation Services*, the agency expressly supplied information that was correct at the time it was conveyed but was later rendered inaccurate.  *See Raytheon v. United States*, 121 Fed. Cl. 135, 163-64, *aff'd*, 809 F.3d 590 (Fed. Cir. 2015) (agency told offeror in discussions that it could not use independent research and development to reduce its performance costs but later concluded the offeror could include these costs; the agency was found to have misled the offeror by failing to inform it of the change in policy); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 371-73 (2009) (agency misled protestor

_____

[5] Indeed, the other offerors received strengths unique to each of their proposals.  One offeror received strengths for its "suggestion to use a Goal Attainment Scale approach" in its process and its "understanding of website and database hosting and design architecture."  (AR 1090.) Another received strengths for "additional cyber security and data protection . . . which exceeds the minimum requirements outlined in the PWS."  (AR 1092.)  Yet another offeror (which did not submit a proposal to the post-corrective action solicitation) received no strengths at all, and therefore could not have inferred any definition of "strength."  (AR 1094.)  None of these assigned strengths would reasonably permit a recipient to infer that the agency was assigning strengths for elements that lowered the risk of unsuccessful performance.

by relying on a flawed independent government cost estimate during discussions and failed to inform the protestor and allow it to prepare a new proposal when the agency revised the estimate); *Veterans Evaluation Services, Inc., et al.*, B-412940, et al., 2016 CPD ¶ 185 (C.G. July 13, 2016) (agency told offerors their proposed prices were fair and reasonable but reevaluated and determined prices were too high; the agency was found to have misled the offerors by failing to communicate the change in price evaluation).

These cases differ from Safal's situation because the DoDEA did not expressly define strength in either of its post-award explanations to Safal. Although the plaintiff argues that the DoDEA's list of strengths in the first post-award explanation "objectively conveyed" a particular definition of "strength," that definition is only one of several possibilities that could have been inferred from the debriefing. While the list conveyed multiple viable interpretations, Safal inferred only one and made a tactical decision to rely on it to prepare its post-corrective action proposal. Safal did not, as in *East West*, select the only reasonable interpretation of the agency's communication (that the protestor's initial proposal included too many staff). Similarly, unlike what happened in *AshBritt*, Safal did not prepare its proposal based on a quantitative pricing benchmark communicated by the agency to the offeror but later corrected without notice to the offeror. Instead, the agency provided Safal with a descriptive list of strengths, but that list lacked the definition of "strength" used by the agency and did not include language to the effect of "this strength was awarded for this specific reason"; the list was purely descriptive, with some objective and some subjective points noted.

The basic difference between the cases on which Safal relies and its own is which party supplied the misleading information. In the other cases in which misleading information was relied on by an offeror, the agency itself had provided the information that became misleading. Here, by contrast, the agency conveyed the results of its evaluation but included no explicit indication of how it arrived at those results; Safal knew its strengths but only inferred from them the reason it had received them. Instead of being misled by the DoDEA, Safal misled itself by making assumptions and drawing incorrect inferences. That problem cannot be attributed to the DoDEA, which did not mislead Safal.

Even if the DoDEA had expressly conveyed its definition of "strength" in the initial post-award explanation, Safal could not have been misled because the definition, although modified, did not change in a meaningfully material way between the initial and revised solicitations. While neither the pre- nor post-corrective action phrasing of "strength" used by the agency was disclosed to any of the offerors prior to submission of proposals, the administrative record reveals that the post-corrective action definition of "strength" was "an aspect of an offerors' proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the [g]overnment during contract performance." (AR 2532.) This revised definition does not on its face exclude strengths originally earned under the plaintiff's assumed first definition ("lowered the risk of unsuccessful performance") or the actual definition ("increases the likelihood of successful contract performance"); it simply makes explicit that an offeror can earn a strength for an aspect of its proposal that is meritorious or exceeds the PWS. Both these attributes would also increase "the likelihood of successful contract performance." It is hard to imagine an aspect of an offeror's proposal that increases the likelihood of success but

either is not meritorious or exceeds the PWS's requirements; it is not a stretch for these two definitions to accommodate each other.

Despite the similarities in the definitions, the plaintiff argues that the revised definition only allowed an offeror to receive a strength by exceeding the PWS requirements. (*See e.g.*, ECF 37 at 7.) This argument reads the definition too narrowly. While an offeror may receive a strength for aspects of its proposal that exceed the PWS requirements, the definition first explains that the agency may also award strengths for any aspect of a proposal "that has merit." (AR 2532.) In a recent case interpreting this exact definition of "strength," Judge Schwartz emphasized this point: the definition "allows the [source selection authority] to assign a strength to a proposal not only when RFP requirements are exceeded, but simply when the [source selection authority] thinks it has merit." *Konecranes Nuclear Equip. & Servs. v. United States*, 165 Fed. Cl. 421, 436 (2023).

Safal's strengths identified in the initial debriefing were aspects of Safal's proposal the agency thought had merit, and the revised definition is also capable of capturing these same strengths. While in practice the agency took the post-corrective action evaluation as an opportunity to examine the proposals "afresh" and assigned fewer strengths to all offerors, the revised definition itself did not necessarily produce this outcome. Safal has not shown anything in the record that leads ineluctably to the conclusion that the revised definition of strength, rather than a new technical evaluation team applying its own judgments, produced the revised result. In short, this is not a case in which the evaluation criteria changed such that it required a different approach to evaluating Safal's bid. Instead, this case involved a superficial change to the definition of strength, which was subsequently applied by a new evaluation team. That team, in turn, reached a different conclusion pursuant to its professional judgment, as was its prerogative. *Regents,* 140 S. Ct. at 1908.

Ultimately, Safal made an error in judgment. Having lost the initial solicitation, it got a chance to compete anew. Instead of taking the opportunity to enhance all the elements of its unsuccessful proposal, it chose to improve only those aspects that had fared poorly in the initial evaluation. Safal now comes and asserts that, had it known the DoDEA would toughen its evaluation criteria, it could and would have improved the stronger parts of its first proposal. Safal chose to rest on its laurels, ignoring that other offerors might also improve all aspects of their first proposals. Its underlying assumption proved to be wrong, but the DoDEA is not to blame. Indeed, as Synergy emphasized during oral argument, the *only* clue that the solicitation explicitly provided about desirable aspects of proposals was its reference that the DoDEA would evaluate technical submissions to "determine how well the offeror's proposed quotation submission meets or exceeds the requirements of the PWS." (AR 258.) This language is repeated in the evaluation criteria for technical requirement subfactors 4 through 9 (subfactors 1 through 3 were rated "pass" or "fail"). (*See e.g.*, AR 258 (subfactor 4: "response will be evaluated on how well the proposed quote submission and resources meet and/or exceed the grant competition and analysis requirements as [c]ited in the PWS").) Instead of relying on this explicit evaluation criterion included in both the pre- and post-corrective action solicitations and available to all offerors, Safal chose to base its revised proposal on evaluation criteria it attempted to infer from between the lines of the individual, descriptive debriefing it had received.

17

## VI.     CONCLUSION

The plaintiff has not shown that the agency misled it by making changes to its definition of strength between the pre-corrective action brief explanation of award permitted by FAR 8.405-2(d) and the post-corrective action evaluation. The agency did not provide Safal with a definition, and Safal's regrets about its post-corrective action proposal come from its own, subjective interpretation of the agency's debriefing.[6] The plaintiff's motion for judgment on the administrative record is denied. The defendant's cross-motion for judgment on the administrative record is granted. Synergy's cross-motion for judgment on the administrative record is granted. A separate order reflecting this outcome will be filed concurrently with this opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**

---

[6] Safal supports its argument with a declaration (ECF 27-1) from its chief solutions officer. That declaration offers a vision of Safal's proposal had it not allegedly been misled. The defendant has moved to strike the aspects of the declaration that go beyond the injunction factors. The motion is granted. The declaration, in which Safal opines on how the allegedly misleading information in the first debriefing affected its revised proposal, was not before the agency at the time it made its decision, and its omission from the record does not preclude effective judicial review of Safal's claim. *See Axiom Res. Mgmt.,* 564 F.3d at 1379-80.